IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CORY D. FOSTER,<br><br>Defendant. | Criminal Action No. 15-21-1 RGA |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LAWRENCE PAYTON,<br><br>Defendant. | Criminal Action No. 15-21-2 RGA |

MEMORANDUM OPINION

Charles M. Oberly, III, Esq., United States Attorney, Edmond Falgowski, Esq., Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, DE.

Attorneys for Plaintiff.

Douglas L. Dolfman, Esq., Law Office of Douglas Dolfman, Philadelphia, PA.

Attorney for Defendant Cory D. Foster.

Edson A. Bostic, Esq., Federal Public Defender, Eleni Kousoulis, Esq., Assistant Federal Public Defender, Office of the Federal Public Defender, Wilmington, DE.

Attorneys for Defendant Lawrence Payton.

February 3, 2016

*[signature]*
ANDREWS, U.S. DISTRICT JUDGE:

The Defendants, Cory D. Foster and Lawrence Payton, each filed motions to suppress. (D.I. 27, 35). The motions are fully briefed. (D.I. 28, 31, 36, 39, 43, 44, 45). The Court held an evidentiary hearing on October 15, 2015. (D.I. 46).

I. **BACKGROUND**

On February 5, 2015, a civilian witness ("CW-2") called 911 to report a suspicious vehicle in the parking lot of the Branmar Plaza Shopping Center in north Wilmington. (D.I. 46 at 157). CW-2 told a dispatcher that two black males were in a silver Honda Accord "just sitting [there], like scoping out." (Def. Ex. 2 at 1). Another civilian witness ("CW") was with CW-2 and was watching the vehicle, from 63 feet away. (D.I. 46 at 150–54, 184). Delaware State Police ("DSP") responded, but the vehicle left the parking lot before officers could locate it. (D.I. 39 at 2). CW-2 followed the vehicle and photographed its license plate. (Gov. Ex. 1 at 1). DSP officers met with the CWs, who gave them the photograph. (*Id.*). Cpl. George ran a check on the vehicle's license plate, revealing that the vehicle had been reported stolen on December 8, 2014, during an armed robbery of a business in Schuylkill Township, Pennsylvania. (*Id.*). That afternoon, Cpl. George emailed her fellow DSP troopers about the stolen vehicle and the suspicious activity by its occupants in Branmar Plaza that morning. (*Id.*). She attached the photograph of the car and warned that the suspects may be "armed and dangerous," based on the record of the armed robbery. (*Id.*).

The following morning, in Branmar Plaza, Cpl. Yeldell noticed the silver Accord from Cpl. George's email the previous day "with two occupants in it who appeared to be feverishly looking about." (D.I. 46 at 12–14). Cpl. Yeldell was driving an unmarked police vehicle and was in full uniform. (*Id.* at 8). Cpl. Yeldell drove in front of the vehicle, momentarily stopped,

1

and made eye contact with the two occupants. (*Id.* at 14–18). Cpl. Yeldell radioed for additional units, drove out to Marsh Road to meet three responding units, and temporarily lost visual contact with the silver Accord. (*Id.* at 18–21). Cpl. Yeldell returned and pulled in front of the silver Accord. (*Id.* at 21–22). No one was inside the vehicle any longer and the individual who was previously in the front passenger seat, later identified as Defendant Foster, was standing next to the driver's side door. (*Id.* at 22). Cpl. Yeldell exited his vehicle, pulled out his gun, and ordered the man to the ground. (*Id.* at 22–23). Foster began to run and another officer subdued him with a taser. (*Id.*). As Defendant Foster fell, a handgun dropped out of his left hand onto the ground. (*Id.* at 24). The officers were then able to physically detain Defendant Foster. (*Id.* at 24–25). Cpl. Yeldell then communicated over the radio to his fellow DSP troopers that they had one suspect in custody, but that the second suspect was still outstanding. (*Id.* at 26).

In the same time frame, Cpl. McColgan was heading to Branmar Plaza from the scene of an accident. (*Id.* at 91). He was the shift commander and was coordinating multiple units to search for the at-large suspect and "lock down that area and set up a perimeter." (*Id.* at 102–03).[1] Heading north on Marsh Road, Cpl. McColgan saw a person, later identified as Defendant Payton, calmly walking southbound on Marsh Road, away from Branmar Plaza. (*Id.* at 92–96, 106, 138). Cpl. McColgan observed Defendant Payton walk by the last few commercial establishments on Marsh Road and eventually cross Mayfield Road. (*Id.* at 124, 127). After observing Defendant Payton from afar for 4 minutes and 19 seconds, Cpl. McColgan stopped him and told him to put his hands on his head. (*Id.* at 125; Gov. Ex. 5, 9:58:14–10:02:33 a.m.). Defendant Payton complied and the officers patted him down. (D.I. 46 at 125). Cpl. McColgan asked Defendant Payton if he had any ID on him, where he was from, and where he was coming

---

[1] Cpl. McColgan's dashboard video camera filmed his drive to Marsh Road. (D.I. 46 at 99–100). The video was shown during the evidentiary hearing and illustrated his testimony. (Gov. Ex. 5).

2

from. (*Id.* at 130–32). Payton said he had no ID, was coming from the market, and he was from Philadelphia. (*Id.*). Payton was not advised of his *Miranda* rights. (*Id.* at 140–41). Officers handcuffed him and transported him to Branmar Plaza. (*Id.* at 133–34). During the ride, Cpl. McColgan obtained Defendant Payton's name and date of birth. (*Id.* at 136). They arrived at Branmar Plaza a minute later, and proceeded with a show up shortly thereafter. (*Id.* at 134, 174).

For the show up, CW sat in the backseat of a patrol car. (*Id.* at 174). Trooper McBean said to CW: "We think we have the other guy. We need you to verify. Can you see him?" (Gov. Ex. 8 at 2). Cpl. McColgan removed a handcuffed Defendant Payton from his vehicle and positioned him so he could be seen through Trooper McBean's front windshield, from about 40 feet away. (D.I. 46 at 135–36, 161, 175). CW identified Defendant Payton as the person he saw in the front passenger seat of the silver Accord the day before. (*Id.* at 153). Cpl. Yeldell also identified Defendant Payton as the individual he saw in the driver's seat of the vehicle earlier that morning and estimated that 15 to 20 minutes passed between the time he first saw him and when Cpl. McColgan brought Defendant Payton back to Branmar Plaza.[2] (*Id.* at 30–31).

## II.   LEGAL STANDARD

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. CONST. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (internal quotation marks omitted). However, "under the exception to the warrant requirement established in [*Terry v. Ohio*], 'an officer may, consistent with the Fourth amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123

---

[2] There is no challenge to Cpl. Yeldell's identification of Defendant Payton.

3

(2000)). While an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch," the Supreme Court has described the reasonable suspicion standard as requiring "some minimal level of objective justification for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations and internal quotation marks omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them . . . ." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonably police officer, amount to reasonable suspicion or to probable cause." *Ornelas v. United States*, 517 U.S. 690, 696 (1996). "[U]nder a totality of the circumstances test, even factors independently 'susceptible to innocent explanation' can collectively amount to reasonable suspicion." *Brown*, 448 F.3d at 252 (quoting *Arvizu*, 534 U.S. at 274).

### III. DISCUSSION

#### A. Defendant Foster's Motion to Suppress

Defendant Foster moves to suppress the weapon obtained by police officers, contending that it was obtained during an illegal seizure. (D.I. 27). His principal argument relies on this Court's decision in *United States v. Nash*, 2002 WL 31500920 (D. Del. Nov. 6, 2002), for the proposition that a seizure occurred when Cpl. Yeldell parked his vehicle in front of the silver Accord. (D.I. 28 at 3–4). Foster argues that Cpl. Yeldell did not have reasonable suspicion when he pulled in front of the silver Accord, because he only had an anonymous tip. (*Id.* at 4–6).

4

Even assuming *arguendo* that Defendant Foster was seized when Cpl. Yeldell pulled in front of the silver Accord,[3] I find that the officers had reasonable suspicion to make a *Terry* stop at this time. Thus, Defendant Foster's reliance on *Nash* is unavailing, because the *Nash* court expressly found that there was "insufficient evidence of record to support a finding of reasonable suspicion to justify the stop of the Cadillac." *Nash*, 2002 WL 31500920, at *4. Here, DSP officers knew the silver Accord was reported stolen from an armed robbery and the suspects were flagged as armed and dangerous. A 911 call the day before indicated that two men were sitting in the vehicle in Branmar Plaza, appearing to be casing one of the Plaza's stores.[4] The same stolen vehicle appeared in the same shopping center the following morning. It again had two men in it. Cpl. Yeldell observed both of its occupants acting suspiciously, and viewed them, even making eye contact. Once Defendant Foster fled from the attempted stop, the officers' reasonable suspicion was elevated to probable cause. *See United States v. Laville*, 480 F.3d 187, 195 (3d Cir. 2007) ("It is well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." (internal quotation marks omitted)).

---

[3] I do not think a seizure occurred when Cpl. Yeldell pulled his vehicle in front of the silver Accord while Defendant Foster was standing next to it. The Third Circuit has explained:
> A seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) submission to "a show of authority." . . . [I]f a suspect in the absence of physical force does not submit to an officer's show of authority, there is no seizure and no Fourth Amendment claim.

*Brown*, 448 F.3d at 245 (citations omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 626–27 (1991)). Here, there was no application of physical force against Defendant Foster. There was undoubtedly a show of authority by Cpl. Yeldell when he pointed his firearm at Foster and said to get on the ground. (D.I. 46 at 23). Defendant Foster did not submit to this show of authority, however, even momentarily. Instead, he immediately ran. (*Id.*). Moreover, unlike *Nash*, 2002 WL 31500920, at *1, Defendant Foster was not inside the vehicle when it was blocked. He was outside of it on foot.

[4] Contrary to Defendant Foster's assertions, the information police obtained from the CWs was not from an anonymous tip. DSP officers met with the CWs in Branmar Plaza after the 911 call, and the CWs gave them the photograph of the vehicle. (Gov. Ex. 1 at 1). CW also testified at the evidentiary hearing. Accordingly, I decline to consider Defendant Foster's arguments regarding the reliability of anonymous tips.

5

Accordingly, the Court will deny Defendant Foster's motion to suppress the weapon found as a result of the stop.

### B. Defendant Payton's Motion to Suppress

Defendant Payton's Motion to Suppress (D.I. 35) raises three issues. First, he argues that officers illegally seized him in violation of the Fourth Amendment. (D.I. 36 at 4). Second, he asserts that his statements should be suppressed because he was neither advised of nor waived his *Miranda* rights. (*Id.*) Third, he contends that CW's out-of-court identification should be suppressed and any future in-court identification precluded, because an unduly suggestive show up violated his due process rights. (*Id.*).

### 1. Constitutionality of Initial Stop

Defendant Payton argues that Cpl. McColgan did not have reasonable suspicion or probable cause for stopping him. (D.I. 36 at 6). He points out that Cpl. McColgan had no physical or clothing description of the suspect he sought. (*Id.*; D.I. 43 at 19, 22). He asserts that he was calmly walking down the road at the time of the stop, not acting suspiciously. (D.I. 36 at 6). The Government argues that the investigative stop and brief detention were lawful under *Terry*, because DSP officers had reasonable suspicion that Defendant Payton was the suspect who had left nearby Branmar Plaza on foot minutes earlier. (D.I. 39 at 9). It argues further that the handcuffing, brief detention, and transportation of Defendant Payton to the nearby shopping center for a show up did not take the detention outside the scope of *Terry*. (*Id.* at 10–17).

I find that the DSP officers that stopped Defendant Payton had a reasonable, articulable suspicion that he was the suspect they sought. After apprehending Defendant Foster at 9:52:30 a.m., finding him armed, and realizing that the second suspect was no longer there, Cpl. Yeldell radioed to inform his fellow officers that the second suspect escaped on foot. (*Id.* at 26; Gov. Ex.

6

6, 9:52:30–55 a.m.). Cpl. McColgan began setting up a perimeter in the area near Branmar Plaza to search for the second suspect. (D.I. 46 at 102–03). At 9:58:14 a.m., Cpl. McColgan spotted an individual walking southbound on Marsh Road, away from Branmar Plaza. (*Id.* at 92–96, 138; Gov. Ex. 5, 9:58:14 a.m.). Cpl. McColgan testified that, in his fourteen years patrolling this area, it was rare to see pedestrians walking southbound on the left-hand side of Marsh Road, the side of the block where he saw this pedestrian.[5] (*Id.* at 92, 112–13, 118; Gov. Ex. 5, 9:58:14 a.m.). Cpl. McColgan also testified that he had never seen this particular individual before. (D.I. 46 at 128). The pedestrian was within Cpl. McColgan's anticipated containment area, as the suspect only left nearby Branmar Plaza on foot several minutes earlier. (*Id.* at 112–13). Officers from multiple law enforcement agencies were looking for the suspect in this specific area, and Cpl. McColgan testified that Defendant Payton was the only pedestrian he saw since he responded in search of the second suspect. (*Id.* at 102–03, 113–14, 129).[6] Cpl. McColgan continued to communicate with other officers searching different areas for the suspect, and they still had not found anyone. (*Id.* at 129). After observing the pedestrian for over four minutes, Cpl. McColgan watched him walk past all the commercial establishments on Marsh Road where he could have stopped. (*Id.* at 127). The pedestrian had reached a stretch of Marsh Road that only contained residential neighborhoods and was a mile from the entrance to Interstate 95. (*Id.*). The video entered into evidence shows that, by the time he was stopped, Defendant Payton was walking along a two-lane, high-speed road with no sidewalks and no other pedestrians in the vicinity. (Gov. Ex. 5, 10:02:33 a.m.). Cpl. McColgan made the investigatory stop only after observing the Defendant for four minutes and 19 seconds, seeing that he did not stop at any

---

[5] Defendant Payton would later cross the street to the right-hand side of Marsh Road, heading southbound, and the stop eventually occurred along the right-hand side of the road. (D.I. 46 at 118).
[6] Cpl. McColgan's testimony was supported by his dashboard video camera. (Gov. Ex. 5). These events occurred in February, when the temperature does not encourage pedestrian activity.

7

commercial establishment, and hearing that his fellow officers had not yet located the suspect. (D.I. 46 at 125, 145; Gov. Ex. 5, 9:58:14–10:02:33 a.m.).

Cpl. McColgan drew from his considerable experience patrolling this area, specialized training, and knowledge that a potentially armed and dangerous suspect had fled on foot in deciding to stop and investigate whether Defendant Payton was the suspect. *See Arvizu*, 534 U.S. at 273. Looking at the events which occurred leading up to the stop, from the standpoint of an objectively reasonable police officer, Cpl. McColgan had a particularized and objective basis for suspecting this pedestrian was the individual that scores of law enforcement officers in the area were seeking.[7] *See Ornellas*, 517 U.S. at 696. In particular, Defendant Payton's proximity to Branmar Plaza when he was stopped—as well as the short amount of time elapsed between when the suspect was last seen at Branmar Plaza and the stop—are striking. Cpl. McColgan spotted him six minutes after Defendant Foster was detained, and stopped him ten minutes after Foster was detained. (Gov. Ex. 5, 9:58:14 a.m., 10:02:33 a.m.; Gov. Ex. 6, 9:52:30 a.m.). Cpl. McColgan first spotted Defendant Payton at a distance that was roughly a 5-minute walk from the stolen vehicle. (D.I. 46 at 187–88). For these reasons, I do not think that the lack of a more detailed physical description of the suspect is fatal to the investigatory stop. Accordingly, I conclude that, under the totality of the circumstances, Cpl. McColgan's decision to subject Defendant Payton to a *Terry* stop was supported by reasonable suspicion.

Furthermore, the fact that Defendant Payton was handcuffed and transported a short distance to Branmar Plaza did not transform the investigatory stop into an arrest. *See United States v. Johnson*, 592 F.3d 442, 448 (3d Cir. 2010) ("Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-

---

[7] Defendant's briefing virtually ignores the fact that multiple law enforcement agencies were actively searching for an armed and dangerous suspect, on foot, in a specifically defined geographical area.

8

valid *Terry* stop into a full-blown arrest."); *United States v. McCargo*, 464 F.3d 192, 198 (2d Cir. 2006) ("We have little trouble concluding that, in some circumstances, police may transport a suspect short distances in aid of a *Terry* stop. The Supreme Court has upheld such transportations . . . ." (citations omitted)). Defendant argues that the investigative stop was essentially an arrest, because it was not reasonably related in scope to the circumstances justifying the stop, but offers little in the way of legal authority as support. (D.I. 43 at 32). Because I think that law enforcement's efforts to promptly determine if they had the correct person in custody were reasonable in scope and duration, these arguments merit no relief.

### 2.  Motion to Suppress Statements Under *Miranda*

Defendant Payton makes a cursory argument that any statements he made after being stopped by Cpl. McColgan should be suppressed because he did not receive or waive his *Miranda* rights. (D.I. 36 at 7). He does not, however, specify what questions constituted interrogation or what statements he would like suppressed. (*Id.*).

*Miranda* warnings are required where a suspect is both: 1) taken into custody, and 2) subjected to interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response. . . ." *Id.* at 301 (footnote omitted). Moreover, basic biographical questions—such as asking for a person's name, address, and date of birth—are generally "outside the protections of *Miranda* and the answers thereto need not be suppressed." *Pennsylvania v. Muniz*, 496 U.S. 582, 600–02 (1990).

Here, the questions Cpl. McColgan asked Defendant Payton immediately as he began conducting a *Terry* stop—if he had ID, where he was from, and where he was coming from (D.I.

9

46 at 130–32)—are the type of biographical questions excepted from the protections of *Miranda*. *See Muniz*, 496 U.S. at 600–02.[8] While being transported to the show up in Cpl. McColgan's car, Defendant Payton was similarly only asked for his name and date of birth. (D.I. 46 at 136). The only other verbal exchange during the ride was initiated by Defendant Payton. (Gov. Ex. 5, 10:04:45 a.m.). These biographical questions also were not reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301. No other questions from police or statements by Defendant Payton appear in the record before the Court. Accordingly, Defendant Payton's broad argument that all his statements should be suppressed will be denied.

### 3. CW's Out-of-Court Identification

In *United States v. Brownlee*, the Third Circuit summarized the legal standard governing unduly suggestive identification procedures:

> An identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process. Unnecessary suggestiveness contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.

*United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citations and internal quotation marks omitted). "As the Supreme Court has acknowledged, a show-up procedure is inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." *Id.* at 138.[9] Indicia of suggestiveness include when a suspect is brought to the scene of a crime, "handcuffed, surrounded by police officers, and either seated

---

[8] At the inception of the *Terry* stop, when these questions were asked, Defendant Payton was also not yet in custody for purposes of *Miranda*. *See Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a . . . *Terry* stop does not constitute *Miranda* custody." (citation omitted)).

[9] Some courts assessing the constitutionality of show ups have essentially assumed that a show up meets the "unnecessarily suggestive" prong of *Brownlee* and have proceeded to analyze the second prong, the identification's reliability. *See, e.g., United States v. Waters*, 428 F. App'x 155, 163–64 (3d Cir. 2011); *United States v. Robinson*, 2014 WL 4408940, at *6 (E.D. Pa. Sept. 8, 2014).

inside or standing beside a police cruiser at the time of the identifications . . . ." *Id.* Suggestiveness may also be exacerbated if only one suspect is presented to eyewitnesses or the eyewitnesses are exposed to the coercive influence of fellow eyewitnesses. *See id.* In *Brownlee*, these factors led the Third Circuit to find that a show up was unnecessarily suggestive. *See id.*

Here, Defendant Payton argues that CW's out-of-court identification should be suppressed, because CW identified him after suggestive comments from police and while Defendant Payton was handcuffed and surrounded by police officers. (D.I. 36 at 9). The Government argues that the show up was not unduly suggestive by distinguishing the instant circumstances from *Brownlee*, because there were not multiple witnesses identifying Defendant Payton at the same time. (D.I. 39 at 20–22). The Government further asserts that even if the show up was unduly suggestive, it was nevertheless sufficiently reliable. (*Id.* at 21–22).

The show up involving Defendant Payton and CW was unduly suggestive. Much like in *Brownlee*, Defendant Payton was removed from the backseat of a police vehicle, handcuffed, and surrounded by police officers. (D.I. 46 at 135–36, 161, 175). The show up took place at the location where CW first saw the suspect and where Defendant Foster had just been detained. Defendant Payton was the only suspect showed to CW. Before the show up, Trooper McBean said to CW: "We think we have the other guy. We need you to verify." (Gov. Ex. 8 at 2). The fact that CW was not surrounded by other eyewitnesses, one factor emphasized in *Brownlee*, does not change the fact that the manner in which this show up was conducted was highly suggestive. Cpl. Yeldell, who had seen the suspect earlier that day, could have and did identify Defendant Payton, which could have confirmed that the officers had the correct suspect, without resorting to a show up with CW. (D.I. 46 at 31). Under these circumstances, like in *Brownlee*,

11

there is no reason why the DSP officers could not have conducted a less suggestive identification procedure. *See Brownlee*, 454 F.3d at 138.

With regard to the second, reliability prong of its analysis, the Third Circuit stated:

> [U]nnecessary suggestiveness alone does not require the exclusion of evidence. A suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability, for reliability is the linchpin in determining the admissibility of identification testimony. As the Supreme Court explained in *Biggers*, in order to determine whether an identification was reliable even though the confrontation was suggestive, we must look to the totality of the circumstances. The Court considers factors that include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

*Id.* at 138–39 (citations and internal quotation marks omitted). In *Brownlee*, the Third Circuit acknowledged that there were some weaknesses in the witness identifications, but ultimately concluded that these shortcomings "go more to the weight of the evidence than the reliability of their identifications, and thus were issues for the jury." *Id.* at 139–40. Significantly, however, the Third Circuit emphasized that the witnesses' "degree of attention was substantial" and "their prior descriptions, while rather general, were fairly accurate." *Id.* at 140.[10]

On February 5, CW viewed the suspect from approximately 63 feet away, with an unobstructed profile view, for about 20 minutes. (D.I. 46 at 151, 184, 187). At the show up, CW did not hesitate and seemed certain in his conclusion that Defendant Payton was the individual he saw the previous day. (Gov. Ex. 8 at 2–3). The length of time between the suspicious

---

[10] Nearly every decision within this Circuit finding an identification sufficiently reliable, despite being unduly suggestive, emphasized that the witnesses' *prior* descriptions of the suspect turned out to be accurate. *See, e.g., United States v. Waters*, 428 F. App'x 155, 165 (3d Cir. 2011) ("[Witness'] view of the perpetrator's face was sufficient for him to give a fairly accurate description to the police . . . ."); *United States v. Robinson*, 2014 WL 4408940, at *6 (E.D. Pa. Sept. 8, 2014) ("[Witness'] description of the robber accurately describes Defendant."); *United States v. Bennett*, 2010 WL 1427593, at *11 (E.D. Pa. Apr. 8, 2010) ("This detailed description of the suspect's clothing almost exactly matched the clothing [Defendant] was wearing when he was stopped . . . .").

12

behavior and confrontation was one day.[11] CW, however, provided no meaningful *prior* description of the suspect before the show up in order to allow this Court to even assess the third, most important factor: "the accuracy of the witness' prior description of the criminal." *Brownlee*, 454 F.3d at 139. CW admitted that on February 5, police did not interview him "in-depth" and that the officers were "more worried about the vehicle at the time." (D.I. 46 at 159). Moreover, CW could not recall giving police officers any physical description of the suspects. (*Id.* at 158–59). In short, there is no record evidence of CW having provided any prior physical description of the suspect before the show up took place.

At the evidentiary hearing, CW described the suspect he saw in the silver Accord on February 5 as follows: "He had a hoodie on, and a beanie. The hood was up, and he had a beard and there were . . . like dark frame glasses." (*Id.* at 153). When prompted for a more detailed physical description, CW responded: "Other than I didn't say that it was a black male. That was it." (*Id.* at 155). This testimony, even on the back end, lacks any sort of specificity and does little to engender confidence in the reliability of CW's identification. Accordingly, the third *Biggers* factor weighs heavily against finding that CW's identification of Defendant Payton was sufficiently reliable to make up for its unnecessary suggestiveness.

Under the totality of the circumstances, I cannot conclude that CW's identification of Defendant Payton possesses sufficient aspects of reliability. *See Brownlee*, 454 F.3d at 138–39. The complete lack of a prior description of the suspect renders CW's identification fatally deficient. *See supra* note 10. None of the other *Biggers* factors—which in the aggregate are, at best, neutral—weigh sufficiently in the Government's favor to make up for this deficiency.

---

[11] It is difficult to assess the fourth factor—the witness' degree of attention—in the absence of any physical description. The evidence suggests that CW was watching the suspects on February 5 for roughly 20 minutes, though much of his description focused on the silver Accord, rather than the individuals. (D.I. 150–51, 159). Accordingly, I consider this factor to be neutral in the reliability calculus.

13

Because I find that CW's identification of Defendant Payton (1) was unnecessarily suggestive and 2) did not otherwise possess sufficient indicia of reliability, it violates his due process rights. *See Brownlee*, 454 F.3d at 157. Accordingly, evidence of CW's out-of-court identification must be suppressed and any in-court identification will be precluded.[12]

## IV.  CONCLUSION

For the reasons set forth above, the Court will deny Defendant Foster's motion to suppress physical evidence, and deny Defendant Payton's motion to suppress as it relates to his Fourth Amendment and *Miranda* claims. The Court will, however, grant Defendant Payton's motion to suppress the out-of-court identification and to preclude any in-court identification by CW. A separate order, consistent with this Memorandum Opinion, will be entered.

---

[12] To be clear, there is no constitutional reason that would prevent the CW from testifying that the man he saw the first day had a beard and dark-frame glasses.

14